SNYDER v. SLAUGHTER et al. (No. 1455.)

(Court of Civil Appeals of Texas. Amarillo. Jan. 15, 1919. On Motion to Retax Costs, Feb. 18, 1919.)

1. NOVATION ⚫═══7—ASSUMPTION OF DEBT—ACCEPTANCE.

Where plaintiffs sued to recover on an agreement whereby appellant assumed a debt of another and became primarily liable, the suit itself is a sufficient acceptance by plaintiffs of the assumption.

2. PRINCIPAL AND SURETY ⚫═══140—JUDGMENT AGAINST SURETY.

Under Rev. St. arts. 1842 and 1897, a judgment cannot ordinarily be had against a person secondarily liable until a judgment is had against the principal obligor.

3. PARTNERSHIP ⚫═══104 — ACTION BETWEEN PARTNERS—NATURE AND FORM.

Where one partner appropriated to his individual use a sum of money which was to have been used in discharging a debt for property acquired by the other partner and delivered to the firm, the other partner cannot maintain an action of assumpsit, but should sue for an accounting.

4. PARTNERSHIP ⚫═══139 — CONTRACTS — ENTITY.

While a partnership is not recognized as an entity, yet partnership contracts and undertakings are determined and adjusted under the rules of law and equity governing that relation.

5. PARTNERSHIP ⚫═══219(1)—ACTIONS—JUDGMENT.

In an action on a note given in payment for bulls bought by first defendant and delivered to a subsequently created partnership between himself and second defendant, held that under the pleadings and evidence a judgment for plaintiff for the full amount against the first defendant and in his favor for half the amount of the note against the second defendant was improper.

Appeal from District Court, Potter County; Hugh L. Umphres, Judge.

Action by Herring & Son against R. L. Slaughter and Marcus Snyder, in which the defendant Slaughter cross-petitioned against the defendant Snyder. From the judgment for plaintiff against the defendant Slaughter, and in favor of such defendant over against the defendant Snyder, the latter appeals. Reversed and remanded.

L. W. Sandusky, of Colorado, for appellant. Veale & Lumpkin and Madden, Trulove, Ryburn & Pipkin, all of Amarillo, for appellees.

HUFF, C. J. The appellees, Herring & Son, brought suit against R. L. Slaughter and Marcus Snyder, on a note for $1,375, dated May 10, 1916, due six months after date, with a credit thereon of $275, made May 23, 1916, executed by R. L. Slaughter, with interest from date at 10 per cent. per annum, and for 10 per cent. attorney's fees, provided for in the note. After the necessary count on the note the plaintiffs allege they had been informed by R. L. Slaughter, "and upon such information and belief thereof they charge that thereafter the said defendants, R. L. Slaughter and Marcus Snyder, made and entered into their certain contract and agreement, by which defendant Slaughter sold and delivered to the defendant Snyder certain bulls and cattle which the said Slaughter had bought from the plaintiffs, and as part of the consideration thereof the defendant Marcus Snyder assumed obligation and bound himself to pay to the plaintiffs the said sum of money called for in said note and to discharge said note according to the

terms and provisions thereof." That by the execution of the note R. L. Slaughter became liable to the plaintiff according to its terms, and by the assumption of its payment Snyder likewise became liable, etc. The defendant Slaughter admitted, as true, the allegations in the petition, and by cross-petition against Snyder alleged that the note sued on was executed by him for certain bulls purchased from plaintiffs, "and that soon after the execution and delivery of said note this defendant sold said bulls and other cattle to the defendant Marcus Snyder, and as part of the consideration of such sale the said defendant Marcus Snyder agreed to assume and pay to plaintiffs herein the note mentioned and described in paragraph 3 of plaintiffs' original petition, as is fully alleged in the fourth paragraph of plaintiffs' said petition (above set out in quotation), and by reason of such sale and transfer the defendant Marcus Snyder became bound and obligated to pay plaintiffs said note according to its tenor, effect and reading, and by reason of the assumption and agreement to pay said note by defendant Marcus Snyder, and by reason of the fact that said defendant has failed and refused to pay same, this defendant, in case a judgment is rendered against him herein, is entitled to have and recover of and from the defendant Marcus Snyder a like judgment." As to Snyder's answer we copy from his brief:

"That he never at any time entered into any contract to purchase the cattle from defendant Slaughter, in which the note or any part thereof which is the subject of this suit was a part of the consideration, but that he did purchase cattle by written contract, which will speak for itself; that he had long since paid the defendant Slaughter all that was due him for the purchase of the cattle, and that he was in no way bound to pay said note to plaintiff or any part thereof; that he should not be held by plaintiffs for the reason that if he ever made any statement to plaintiffs relative to the payment of said note it was done purely as a gratuitous conditional guarantor, which was never accepted by said plaintiffs, and therefore not binding on him."

The evidence shows substantially that Slaughter had leased four leagues of land, for which he had paid about $2,400, and on this he was ranching and holding the cows and steers; that there were negotiations between Slaughter and Snyder for some two or three weeks, which resulted in a contract between them. Slaughter sent a telegram to Snyder, which telegram has no date:

"Your offer is below cost but I want to join you so will sell half interest for thirty-five, all Mexican steers and cows, and forty for native Slaughter Company steers. Recently bought L. S. bulls at fifty-five. You will pay half at cost."

Snyder answered by wire May 12, 1916:

"Will accept your proposition when you arrange to tally cattle. Are you coming to Dallas any time soon? If so will meet you there and straighten up our deal."

They entered into a written contract, which is dated May 12, 1916, which recites: That Slaughter was the owner of a certain lease of four leagues of Coke county school land, which lease is dated January 1, 1916, and expires January 1, 1917, at the rate of 13 cents per acre per annum, and the owner of about 850 head of Mexican and Arizona cattle then on the land, which cattle were subject to a certain mortgage of $15,000, 8 per cent. interest given by Slaughter to the Bankers' Trust Company of Dallas, and was also the owner of about 270 head of two year old Hereford steers on the land, which were subject to mortgage executed by Slaughter to C. C. Slaughter Cattle Company, Dallas, Tex., in the sum of $9,000, interest at the rate of 10 per cent., due December 31, 1916. That Slaughter was desirous of selling an undivided half interest in all the said property, subject to the mortgages, and Snyder was desirous of purchasing a one-half interest and assuming one-half of the mortgage on said property. It was therefore agreed to sell and purchase an undivided half interest in the property upon the terms and conditions following: The purchase price of all Mexican and Arizona cattle should be at the rate of $35 per head; all 1916 calves to go free. The price of the two-year old steers at the rate of $40 per head. That all of said cattle should be counted and the number determined on or before June 1, 1916, which should be the basis for the full amount to be paid by Snyder to Slaughter for the undivided half interest. From the date of the contract Snyder should be chargeable with and pay one-half of the rental on the land above mentioned, and each party should pay in equal proportion all expenses of counting the cattle, running, feeding, caring for, and marketing the same, and all incidental expenses connected with the handling of the cattle in every way, manner, shape, and form. That Snyder had that day paid $2,000 as a partial payment of the purchase price. That upon the completion of the count of the cattle as above mentioned, Snyder should make his note payable on or before six months from the date of the contract, with 8 per cent. interest. The amount of the note to be determined by the number of cattle at the price agreed upon less the $2,000 paid. That Snyder should have charge of the running, handling and marketing of the cattle, and that neither were to receive any salary or remuneration other than actual expense in connection with the handling of the cattle. It will be perceived the bulls are not mentioned in the contract which the parties re-

duced to writing. The note sued on was given to Herring & Son for the purchase price of the bulls, and the note is dated May 10th, two days before the contract bears date. The evidence suggests that the purchase of the bulls and the execution of the note occurred while negotiations were in progress between Snyder and Slaughter. At the direction of Slaughter the bulls were shipped by Herring, and possibly consigned to the foreman of the C. C. Slaughter Company's ranch, but the evidence shows that Snyder got them from the foreman and placed them with the herd, one-half of which he had purchased, and for the use of that herd. On the 21st of May, after the contract, Snyder wired Slaughter that he had an offer of $40 for the cows and bulls, and later wrote, on June 15th, that he had sold the cows and bulls at $40, and suggested that, since they had lost part of the pasture, he (Snyder) would purchase the rest of the steers at contract price, etc. In this letter he stated:

"I kept out enough money to pay for the bulls. They were from twelve to fifteen years old and one of them never did get to the ranch."

He wrote again on the 28th of December. They had a lot of cattle on hand, and had to buy feed so that he was short of cash. "However, I will fix it with Mr. Herring. I am writing him to-day, asking him to extend the note until April 1st, and at that time I will take it up. I have also written him I would sign it also. I think this will be satisfactory with them. * * * As soon as I hear from Herring I will fix this up some way." On the 25th of April, 1917, he again wrote, acknowledging receipt of a letter from Slaughter, stating that he could not understand Slaughter; that he had done well with the cattle, and had paid all expenses himself, and got all out of them that he could, but if Slaughter felt "that" way about it, to write what he would take in dollars for the rest and "clean up the deal." "I would of paid Herring, but did not have the dough." He asked Slaughter to state how many thousand dollars he wanted, and if satisfactory he would send Slaughter his check. Again, on May 6, 1917, he wrote Slaughter, stating he knew what they had up there and what they sold; that the cattle that they had left are the "tail end," as he knew; that he had paid all the expenses since he took charge, and if Slaughter wanted to get his money out and wind up that he would give him $7,000 and take over the cattle they had left; that they would not bring near that money; that he was just doing it to clean up the deal. Slaughter testified: That in about 10 days after the last letter they dissolved the partnership, and he accepted Snyder's offer of $7,000, which was paid him. That there was nothing said at that time about Slaughter still owing the note. Snyder said everything was paid up, and no details were called for. Snyder did not account to him in any way for the price received in the sale of the bulls, "other than to put them in the business." That the price received for the bulls made a loss, "but he was probably making some money on the rest of the cattle so that he could afford the loss." In testifying as to Snyder's letters, in which he had stated that he kept out the money for the Herring note, and that he used that money for other purposes, "I suppose in the business, and later he agreed to pay Mr. Herring;" that Snyder did not offer to pay him for the bulls, but it was to go to Herring; that at the time the partnership was formed they had three obligations; and that he stood responsible on all the obligations, and Snyder was to stand his part. By the contract Snyder was to give his note, but never did, and none was ever demanded. He testified that when he closed out with Snyder he believed the Herring note had been paid "because Snyder told me that." That at the time he received the $7,000 in winding up he believed that the Herring note had been paid, else he would not have accepted the $7,000. On cross-examination Slaughter testified that at the beginning of the negotiations with Snyder for all the cattle there were no bulls and none mentioned, but whether the deal went through or not it was necessary to have these bulls, so he (Slaughter) went ahead with the bull deal which he closed in the meantime. That having talked to Snyder "the last time" he closed the bull deal and sent the telegram, notifying him the bulls had been purchased, and that he must take a half interest in them, which he accepted. In referring to the contract drawn between them he said:

"There is no provision in the contract with reference to the Herring bulls." "They were a side deal, which was made after we had agreed on the contract." "My sale of half interest in these cattle to Snyder was not based upon the proposition that Snyder was to pay me for half the bulls and then take up the Herring note in addition thereto. The Herring note was practically the same as the two notes payable in Dallas to the Bankers' Trust Company. Snyder was not on the Dallas notes, but he paid them out of the company fund the same as he should have paid the Herring note. I never even took Mr. Snyder's note for any of that stuff."

He further testified:

That Snyder did not pay him, but had to pay some one else, and, instead of paying Slaughter, Snyder was to pay up their obligations "out of our funds. We agreed there would be no division, and we would draw no profits until the obligations had all been paid. I paid $2,400 for my lease, spot cash, just previous to making the deal with Mr. Snyder, and he paid me back $2,000, and we started the deal in good faith after that, and he was to take up

the obligations as they came due, these different notes, and he did take them all up except the Herring note. He postponed that after many assurances that he would take it up presently. One time he said he had the money in the bank for a while, and then later he found it was necessary to use it. We were getting along all right, and he would take it up and pay it, and if he had taken up that note everything would have been all right. All these notes went with the cattle and the horses, and everything. Notes and property all went in together, and he was to pay off everybody else before he or I, either one, used any money, and if there was any profits left we would divide it."

Snyder testified, in substance: That at the time of entering into the contract with Slaughter he (Slaughter) owed the two notes mentioned in the contract, $15,000 and $9,000, respectively. After closing the deal he sold 328 head of cattle for $40 a head. The bulls were included in the number, and that he paid the Bank & Trust Company, and later he shipped some steers to Ft. Worth and sold them and took up all of Slaughter's paper and cleaned up the debts. After paying these debts and the running expenses there was not a nickle left of the proceeds which had been received from the sales up to that time. That he carried the expense account himself for a long time until he sold the cattle, and that he deducted the proceeds from what he had been out, and there was no money coming after the two notes were paid. That after the above sales they had 231 cut-back steers, which he afterwards bought from Slaughter at $7,000. At the time he bought Slaughter's interest he asked Slaughter if he paid the Herring note, and he said it was all clear, and there were no debts at all. That he knew there were no debts if the Herring note had been paid, because he had cleared all others. He also stated with reference to his statement in the letters that he would hold out the money to pay the Herring note. "I will say I tried to hold it out, and the Bankers Trust Company would not let me." That he bought the remainder of the cattle from Slaughter for $7,000, and he told me at that time that the Herring note and all were settled, and that there was no indebtedness whatever on the cattle. He admitted writing a letter to Herring that he would pay the note and asking for time, and in doing that he thought he was accommodating Herring, that he was trying to help Herring work the money out of the cattle, and that he was trying also to accommodate Slaughter and to work the money out of the cattle to pay for the bulls for Slaughter. Slaughter was recalled, and testified:

"I absolutely did not tell Mr. Snyder at Colorado City on the Sunday I had my negotiations with him that I had paid the Herring note."

208 S.W.—62

On the 28th of December, 1916, Snyder wrote Herring that:

He was in receipt of a letter from Slaughter in regard to the note held by Herring against him for some bulls. "I told Mr. Slaughter I would take this note up. I had to sell my calves last fall on credit, the 1st of April, and it has put me short on cash, so I am going to ask you to extend this note until April 1st, and I will indorse it and see that it is paid at that time."

Herring shows he received the letter and afterwards wrote Snyder to the effect that if he expected to pay the note, it was due, and he would like to have him do so; that he knew nothing about the transaction between Slaughter and Snyder, except as was written in the letter. The testimony shows that, in order to ascertain the amount of money due Slaughter for sale of a half interest in the cattle, no count was ever made of the cattle, except as they were afterwards sold by Snyder and no demand was made for a note or for a count of the cattle, as provided for in the contract.

The case was submitted to the jury upon but one issue: "Did R. L. Slaughter at the time he sold his interest in the ranch and cattle, owned by Slaughter and Snyder as partners, represent or state to the defendant Snyder that the note in the suit had already been paid by defendant R. L. Slaughter?" The jury answered, "No." The court rendered a judgment in favor of Herring & Son for the principal, interest, and attorney's fees due on the note, $1,448.62, against R. L. Slaughter alone, and adjudged that R. L. Slaughter recover judgment against Snyder for one-half of the recovery, $724.31.

Snyder appeals from the judgment. His first assignment is based on the refusal of an instructed verdict in his favor. His proposition substantially is that there were no pleadings or evidence upon which to base a verdict and judgment against him.

The second assignment asserts error in the action of the court in submitting the issue he did for the reason that there was only one issue under the pleadings. That is: "At the time defendant Snyder purchased a one-half interest in the cattle from Slaughter as part of the consideration therefor, did Slaughter assume payment of the note in controversy?" Third the court erred in rendering judgment in favor of Slaughter against Snyder for one-half of the judgment rendered for plaintiffs against Slaughter, because the court evidently rendered judgment on the theory that the note was a partnership debt when there was no allegation, either in the original petition or cross-action of Slaughter, that Slaughter was a partner with Snyder. Both Herring & Son and Slaughter present cross-assignments, based on a request for an instructed verdict in their favor, and Slaugh-

ter also requested the submission of an issue as to whether Snyder assumed payment of the note as part of the consideration in the sale and purchase of the cattle.

[1] The pleadings of Herring and Slaughter set up the individual liability of Snyder to pay the note in suit; that is by assumption he became the primary obligor and Slaughter secondarily liable thereon. Herring & Son, by accepting the contract of assumption, agreed to accept Snyder as the principal obligor and to look to him as the principal, so that as to all parties in the suit, under the pleadings, the relation of principal and surety existed between Snyder and Slaughter. This would not be true as to Herring & Son, if they did not accept the assumption, even though they may have had notice. This suit, however, being based on the assumption, perhaps would be sufficient as to an acceptance on their part. Shapleigh v. Wells, 90 Tex. 110, 37 S. W. 411, 59 Am. St. Rep. 783; Abernathy v. McDougle, 187 S. W. 503; Newby v. Harbison, 185 S. W. 642; Hill v. Hoeldtke, 104 Tex. 594, 142 S. W. 871, 40 L. R. A. (N. S.) 672.

[2] In considering what judgment this court would be authorized to render or whether we could affirm in part and reverse in part, it has occurred to us that if Herring's contention be true, as is insisted on by them in this court, that is, that Snyder is the principal obligor, then under the pleadings possibly we would not be authorized to render judgment for them against Slaughter alone, for under the pleadings he is only a surety. A judgment cannot be had ordinarily against a person secondarily liable until a judgment is had against the principal obligor. R. C. S. arts. 1842 and 1897.

[3-5] This being the state of the pleadings, could the court, under the evidence showing a partnership debt by assumption, make Snyder liable for one-half of the debt to Slaughter? Just how the court reached this conclusion we are not advised, but, as we conceive it, he must have determined either that it was a partnership debt or that it was not a partnership debt, and that by agreement Snyder assumed to pay one-half of the obligation, which in either event there were no pleadings authorizing the judgment. If the pleadings and evidence established either of such deductions, Herring & Son should have had judgment, if it was a partnership debt against both Snyder and Slaughter for the entire debt; but if it was nothing but an undertaking on the part of Snyder to pay one-half of the debt, then Herring & Son should have had judgment against Slaughter for all the debt and against Snyder for one-half, with the right of Slaughter to recover half against Snyder should Slaughter pay all. If the partnership was existing at the time the suit was filed, and the note was a partnership debt, Slaughter could not sue his partner Snyder thereon. The pleadings do not allege any fact upon which the rights of the partners may be adjusted. The evidence clearly raises the issue that the debt was a partnership obligation; and, while the letters of Snyder to Herring & Son and to Slaughter state he had held out of partnership funds sufficient to pay the debt, or possibly had or would pay it, there is no allegation or proof as to the matter further than that he did not pay it; that he appropriated the same to his individual use. If he appropriated it to his individual use during the partnership Slaughter would have no action in assumpsit for the money so appropriated, but his remedy would be a suit for an accounting whereby Slaughter might have charged Snyder with the funds so appropriated. Clearly the pleadings did not authorize an accounting. If the partnership was settled without taking into account the note, this would not relieve the partners of liability to pay the debt to Herring. The evidence indicates the note was not taken into consideration when Snyder bought out Slaughter's interest in the remnant of the cattle for $7,000; each of the parties contending that the other had represented that he had paid the note, and that it was not outstanding. Under the issue submitted to and found by the jury Slaughter did not represent that he had paid the note, but the jury were not called upon to answer whether Snyder induced Slaughter to make the settlement and accept the sum paid for the remnant. There is no pleading raising such an issue; neither were there any pleadings raising the issues submitted and answered. It is manifest the evidence presents the issue of a partnership indebtedness and a partnership liability. The pleadings in no way suggest such an issue. While it is true that in this state a partnership, as an entity, is not recognized in suing the partnership, that is the members of the partnership must be sued individually, and in suing the partnership must sue as by the individual members (Frank v. Tatum, 87 Tex. 204, 25 S. W. 409), yet partnership contracts and undertakings are nevertheless determined and adjusted under the rules of law and equity governing that relationship. The evidence is not conclusive as asserted by both the appellees that Snyder assumed to pay the note, and thereby made it his obligation. It is strongly suggested that it was made a partnership debt by the acts and agreements of Snyder and Slaughter. The evidence also suggests that under the terms of the written contract Snyder agreed to pay one-half of the debt; that is, by reading the contract in connection with some of Slaughter's testimony. But the evidence is not conclusive by any means that Snyder assumed to make the debt his debt. His letters that he would pay, had paid, intended to pay, or had reserved out of the sale

of cattle funds sufficient to pay are not conclusive that it was or is an individual obligation of his by assumption; especially is this true in the light of the testimony of both Slaughter and Snyder. Neither does the evidence conclusively establish that when Slaughter sold his interest in the remnant for the sum of $7,000 to Snyder, that he (Snyder) then assumed as part of the consideration thereof the note in question.

The pleadings did not authorize the judgment rendered; neither did it authorize an instructed verdict for the appellees or either of them. As we have conceived it, under the record in this court, the best interests of all parties require that the cause be reversed and remanded, and it is accordingly so ordered. The costs of this appeal will be taxed against the appellees equally.

### On Motion to Retax Costs.

The motion of Herring & Son to retax costs will be sustained. Upon consideration we believe that the equities are with the motion, and the costs of this appeal will be taxed alone against the appellee R. L. Slaughter.